# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# FT. MYERS DIVISION

**UNITED STATES OF AMERICA,**

        **Plaintiff**

**-vs-**                                           **Case No. 2:07-cr-118-FtM-99DNF**

**BOBBY DEWAYNE POWERS,**

        **Defendant.**

_____

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

    This cause came on for consideration on the following motion filed herein:

> **MOTION:**     **MOTION TO SUPPRESS IDENTIFICATION EVIDENCE (Doc. No. 19)**
>
> **FILED:**     **August 15, 2008**
>
> _____
>
> **THEREON** it is **RECOMMENDED** that the motion be **DENIED**.

    The Defendant, Bobby Powers is requesting that the Court suppress all identification evidence related to an incident that occurred on June 14, 2007. The Government filed a Response (Doc. 21) on August 26, 2008. The Defendant is charged in a one count Indictment with being a felon in possession of a firearm in violation of 18 U.S.C. §922(g)(1) and 924(e).

    **I. Testimony and Evidence**

    The Government presented the testimony of Phillip Babic, Deputy Chris Nebel, and Deputy Jennifer Torres. Deputies Nebel and Torres are employed by the Lee County Sheriff's Office.

### A. Testimony of Phillip Babic

On June 14, 2007, at approximately 3:15 a.m. Phillip Babic ("Babic") was sleeping in his chair in the living room of his trailer. (Tr.[1] p. 4, 5, 7). Babic has pain, and does take medication for it, but on the night in question, he did not take his medication, and therefore was not sleeping soundly. (Tr. p. 41-42, 49). The television set was on. (Tr. p. 7). He woke up and saw someone going out the front door of his trailer. (Tr. p. 8). He got out of his chair and began chasing the person. (Tr. p. 8). Mr. Babic is 70 years old. (Tr. p. 6). There are street lights every 50 feet in the trailer park. (Tr. p. 8, 9). He could not see the features of the person, but did see that he was wearing dark clothing, and was bald or had a closely shaven head. (Tr. p. 8). At that time, Babic did not know if the person took anything from him. (Tr. p. 9-10). The person did not turn around during the chase, and eventually got away. (Tr. p. 10).

When Babic returned to his trailer, he saw a bicycle in front of the screen door of his trailer. (Tr. p. 10). He knew the bicycle was not his, and assumed it belonged to the person who broke into his home. (Tr. p. 10). Babic noticed that the bicycle had "knobby" tires like a road bike or mountain bike and was blue or purple. (Tr. p. 10). He set the bicycle next to his lanai, called 911, and told the dispatcher that his home had been broken into by someone. (Tr. p. 11).

While he was on the phone or shortly after he hung up, Babic saw the person come back for the bicycle. (Tr. p. 11, 12). Babic was standing in the front door of his trailer and the person was 2 ½ feet to 3 feet away from him. (Tr. p. 12). Babic got a look at the person's face. (Tr. p. 11). The lanai lights were on and the person was visible. (Tr. p. 13). Babic described the person as being 5'10

---

[1] "Tr." refers to the Transcript (Doc. 31) of the of the hearing held on September 18, 2008.

to 6' tall, thin, wearing dark clothes, a white male with a shaved or bald head. (Tr. p. 14). Babic thought the person was in his mid-twenties. (Tr. p. 14). He reminded him of a man that he had seen in the trailer park. (Tr. p.1 4). Babic chased the person on the bicycle for approximately 2 or 3 seconds, but again the person got away. (Tr. p. 15). The person on the bicycle was heading toward the high school and middle school going west. (Tr. p. 16-17). Babic believes that he again called 911 and while he was talking to the dispatcher, he was told that an officer had stopped someone who fit his description and that an officer would take him to that person. (Tr. p. 18). At some point, he realized that his gun was missing. (Tr. p. 17). He had put the gun on the table near him to clean it, and had not put it back. (Tr. p. 17-18).

A deputy came to his residence approximately ten minutes later, and told Babic that an officer had someone who fit the description that Babic gave, and would he be willing to go and see if he could identify the person. (Tr. p. 18-19). Babic agreed to accompany the officer and Deputy Nebel took Babic to Stockton Street. (Tr. p. 19). Babic did not have much of a conversation with Deputy Nebel as the trip was less than a mile away. (Tr. p. 19-20). When Babic arrived at Stockton Street, he saw a man getting out of a patrol car. (Tr. p. 21). The man might have been handcuffed. (Tr. p. 24, 34). He was "as sure as you can be" that this was the person. (Tr. p. 21). Babic asked to see the bicycle. (Tr. p. 21). Before seeing the bicycle, he was 95% sure that it was the same person he saw at his residence, but after seeing the bicycle, he was 100% sure. (Tr. p. 22). Babic testified that he was very careful when he identified the Defendant because he had a younger brother that was the victim of misidentification. (Tr. p. 21-22). Babic asked a deputy if a pistol was found. (Tr. p. 23). He told a deputy that his pistol was stolen and asked the deputy to look for it. (Tr. p. 23). Later, Babic identified the pistol found as his gun. (Tr. p. 18, 26).

### B. Testimony of Deputy Nebel

Deputy Nebel testified that on June 14, 2007, at approximately 3:15 a.m. he was on duty, in uniform, and in a patrol car. (Tr. p. 53-54). He responded to a call that a burglary just occurred at 1895 N. Tamiami Trail. (Tr. p. 54). The dispatch was that a suspect came into the trailer, took a firearm, and left on foot. (Tr. p. 54). When he arrived at the residence, Babic told him that while he was asleep in the chair, a white male entered his residence, and took his firearm. (Tr. p. 55). Babic stated the he returned to the residence to call 911, and found the person's bicycle. (Tr. p. 55-56). He moved the bicycle, and then the person returned, got on the bicycle and left. (Tr. p. 56). Babic said the bicycle was dark colored or blue. (Tr. p. 56). Babic told Deputy Nebel that the person was approximately 5'10' wearing black clothes, and the person fled towards the west. (Tr. p. 56-57).

Within a couple of minutes after arriving at Babic's residence, Deputy Nebel received a call on the radio that Deputy Torres stopped someone matching the description given by Babic. (Tr. p. 57). Deputy Nebel asked Babic if he would accompany him because an officer had found someone who matched the description he gave. (Tr. p. 58). Within a few minutes of receiving the call, Deputy Nebel and Babic arrived at the scene. (Tr. p. 59). Deputy Nebel did not see the person get out of the patrol car and was not sure if the person was handcuffed. (Tr. p. 60). Deputy Nebel asked Babic if this was the person who had done the burglary to his home. (Tr. p. 60). It took Babic a few seconds to identify the person as the one that was at his residence, and Babic also positively identified the bicycle. (Tr. p. 61-62). Babic identified the person before seeing the bicycle. (Tr. p. 62).

### C. Testimony of Deputy Torres

Deputy Torres was on patrol on June 14, 2007, in the early morning hours. (Tr. p. 71). She was in uniform in a patrol car. (Tr. p. 71-72). She saw a person on a bicycle going very fast with no

bicycle lights in the front or back of the bicycle which is a violation of State law. (Tr. p. 72). The person was wearing a black shirt and black jeans. (Tr. p. 73). When she turned her patrol vehicle around, the person pedaled his bicycle faster. (Tr. p. 73). She turned on her lights to conduct a traffic stop. (Tr. p. 73). The person did not stop, so she hit her siren and the person made a quick left turn down a dimly lit street, and she followed him. (Tr. p. 74). She lost eye contact with him for a short period of time when he made the left turn. (Tr. p. 75). The person jumped off the bike and stopped. (Tr. p. 74). The Defendant became argumentative, and only gave his name and would not answer questions as to where he was going. (Tr. p. 75). The Defendant was out of breath and sweating. (Tr. p. 76). He was riding in a direction away from Jones Mobile Home Park. (Tr. p. 76). When she began to write the citation, she received a dispatch of a burglary in progress in her area, and with a description of the suspect as a white male in dark clothing, on a bicycle going westbound. (Tr. p. 77). She contacted the responding deputy which was Deputy Nebel and said that she had a person matching the dispatch description. (Tr. p. 77-78). Deputy Nebel asked her to detain the Defendant to do a show-up. (Tr. p. 78). Deputy Torres detained the Defendant in the back of the patrol vehicle, but did not put him in handcuffs. (Tr. p. 78). Deputy Nebel arrived at the scene approximately 5 to 10 minutes after Deputy Torres first contacted dispatch. (Tr. p. 79). Deputy Torres stated that she was detaining the Defendant to investigate the burglary. (Tr. p. 79). She also wrote him a citation for having no bicycle lights while she waited for Deputy Nebel to arrive. (Tr. p. 79-80). A spotlight was put on the Defendant for the identification. (Tr. p. 101). A gun was found later where the Defendant had turned left turn down the street.(Tr. p. 82).

**II. Analysis**

The Defendant argues that the police illegally detained him in the absence of reasonable articulable suspicion, and that the police conducted an impermissibly suggestive show-up identification procedure. The Government responds that the stop, detention, and show-up procedures were lawful.

**A. Stop and Detention**

The Defendant contends that his detention was unlawful based upon the lack of reasonable suspicion and probable cause that he had engaged in any unlawful activity. The Fourth Amendment prohibits "unreasonable searches and seizures." U.S. Const. Amend. IV. An officer may briefly detain an individual if the officer has a reasonable and articulable suspicion that the person has committed or is about to commit a crime. *Terry v. Ohio*, 392 U.S. 1, 21-22 (1968). "In *Terry* the Supreme Court 'carved out a narrow exception to the [Fourth Amendment] probable cause requirement, allowing police to detain a suspect based on reasonable suspicion for the purpose of an investigative detention.'" *United States v. Williams*, 185 Fed.Appx. 866, 868-69 (11th Cir. 2006) (quoting *United States v. Hastamorir*, 881 F.2d 1551, 1556 (11th Cir. 1989)). The Court must consider the totality of the circumstances in determining whether an officer had a "'particularized and objective basis for suspecting legal wrongdoing.'" *U.S. v. Medlock*, 146 Fed.Appx. 470, 472 (11th Cir. 2005) (quoting *United States v. Hunter*, 291 F.3d 1302, 1306 (11th Cir. 2002) (quoting *United States v. Arvizu*, 534 U.S. 266, 274 (2002)).

To determine if the *Terry* stop was reasonable, courts consider the following four factors: "(1) the purpose of the detention; (2) the diligence of the police in conducting the investigation; (3) the scope and intrusiveness of the detention; and (4) the duration of the detention." *United States v.*

*Williams*, 185 Fed.Appx. at 869.  An officer is permitted to handcuff a suspect during an investigatory stop when it is reasonable under the circumstances to protect the officers or the public.  *United States v. Williams*, 185 Fed.Appx. at 869.

In the instant case, the purpose of the initial stop and detention was to give a citation for the failure to have the proper lighting and reflectors on a bicycle.  Pursuant to Fla. Stat. §316.2065(8)

> Every bicycle in use between sunset and sunrise shall be equipped with a lamp on the front exhibiting a white light visible from a distance of at least 500 feet to the front and a lamp and reflector on the rear each exhibiting a red light visible from a distance of 600 feet to the rear.  A bicycle or its rider may be equipped with lights or reflectors in addition to those required by this section.

Deputy Torres saw the bicycle without the proper lighting and had probable cause to stop the Defendant for that purpose.   Deputy Torres began writing a citation for the violation of the Florida Statute.

Deputy Torres was diligent in her investigation concerning the bicycle light violation.  While she was detaining the Defendant for this violation, she received the call from dispatch that a white male wearing dark clothing and riding a bicycle was a suspect in a burglary that occurred within a close proximity to the area where she had stopped the Defendant.  She immediately contacted Deputy Nebel and told him that she had an individual that matched the description.  She was diligent in her inquiry regarding the burglary investigation.

Deputy Torres detained the Defendant in her patrol car until Deputy Nebel arrived.  The testimony regarding whether the Defendant was in handcuffs was in conflict.  However, Deputy Torres was by herself at the beginning of the stop and for her own safety as well as the safety of others, handcuffs, if used, would have been appropriate.  The Defendant was seated in the back of the patrol car until Babic arrived, and then he was removed from the patrol car for the identification.  The scope

and intrusiveness of the detention was lawful. The length of the detention was also minimal. Deputy Torres testified that it was ten minutes at most after she contacted dispatch regarding the stop that Deputy Nebel arrived with Babic. The identification itself took only a few minutes. The length of detention was brief. The Court determines that the *Terry* stop and detention of the Defendant was reasonable and lawful.

### B. Show-Up

The Defendant argues that the show-up identification of him was unduly suggestive and a violation of his due process rights. "To suppress identification testimony, a defendant must establish that the identification procedure was unduly suggestive, and then he must establish that the identification was unreliable under the totality of the circumstances." *United States v. Walker*, 201 Fed.Appx. 737, 741 (11th Cir. 2006) (citing *United States v. Diaz*, 248 F.3d 1065, 1102 (11th Cir. 2001)). Show-up identifications have been widely condemned, however an immediate confrontation allows identification before a suspect has the opportunity to change his appearance, the memory of the identifying person is fresh, and allows for the quick release of an innocent person. *Blanco v. Singletary*, 943 F.2d 1477, 1509 (11th Cir. 1991). A show-up identification is not "'unnecessarily suggestive unless the police aggravate the suggestiveness of the confrontation.'" *Walker*, 201 Fed.Appx. at 741 (quoting *Johnson v. Dugger*, 817 F.2d 726, 729 (11th Cir. 1987).

When considering the totality of the circumstances to determine if an identification is reliable, a court must consider the following factors: 1) the opportunity of the witness to view the suspect at the time of the crime; 2) the degree of attention of the witness; 3) the accuracy of the witness' prior description of the suspect; 4) the level of certainty demonstrated by the witness at the confrontation;

and 5) the length of time between the crime and the confrontation. *Neil v. Biggers*, 409 U.S. 188, 199 (1972). In the instant case, no issue was raised as to the length of time between the crime and the confrontation.

Babic had two opportunities to view the suspect. The first opportunity was when he woke up, saw someone leaving his trailer, and gave chase. He testified that he did not see the face of the person at that time, but knew the person was wearing dark or black colored clothing and was bald or had a closely shaven head. Babic's second opportunity was when the suspect returned for his bicycle. Babic testified that he saw the face of the suspect for a few seconds while the suspect was picking up his bicycle. The bicycle was in the lanai area and Babic had the lanai lights on so he could see the individual well. He was only 2 ½ feet to 3 feet from the suspect. Babic had ample opportunity to view the suspect.

As Babic testified, during his second opportunity to view the suspect he had his full attention on the person. Babic's residence had just been burglarized and he believed the person who burglarized his trailer left his bicycle. Therefore, when he saw the suspect returning, his full attention was on trying to see the suspect well enough to identify him.

Babic testified that he was certain that the suspect was the same person who burglarized his home and returned for the bicycle. He stated that he was 95% sure when he looked at the person and 100% sure when he saw the bicycle. Babic also testified that he wanted to make absolutely sure before he identified the suspect because his brother and been the victim of misidentification.

Babic described the suspect as a white male, wearing black or dark closing, being approximately 5'10", thin, with a shaved or bald head on a bicycle. This description was accurate of the Defendant.

He was wearing dark clothing, had a shaved or bald head, and was a white male. The description may not have provided a great many details, however, it was accurate.

The Court determines that the show-up was not impermissibly suggestive. Babic had the opportunity to view the suspect two times, Babic gave the suspect his full attention when he returned to pick up his bike, Babic accurately described the Defendant to the 911 operator, was very certain of his identification, and the length of time between the crime and identification was approximately 10 minutes.

### III. Conclusion

The Court respectfully recommends that the Motion to Suppress Identification Evidence (Doc. 19) be denied and all identification evidence not be suppressed in this case.

Failure to file written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

Respectfully recommended in Chambers in Ft. Myers, Florida this ___8th___ day of October, 2008.

_____
DOUGLAS N. FRAZIER
UNITED STATES MAGISTRATE JUDGE

Copies: All Parties of Record